IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

        **v.**              **CRIMINAL NO.** 08-244 (FAB)

JOSE L. REYES-GUERRERO [2]; and
JUAN A. MIESES a/k/a
DAVID VAZQUEZ-COSS [3],

    **Defendants.**

---

**OPINION AND ORDER**

BESOSA, District Judge.

    On February 23, 2009, following five days of trial, a jury convicted Jose L. Reyes-Guerrero ("Reyes-Guerrero") and Juan A. Mieses ("Mieses") of conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of Title 21, U.S.C. § 841(a)(1) and § 846.  Subsequently, on March 3, 2009, the defendants filed a motion for judgment of acquittal.  (Docket No. 80)  On May 4 2009, the United States filed its opposition. (Docket No. 91)

    The defendants base their "motion for a judgment of acquittal" on three grounds:[1]  (1) the Court erred in admitting the testimony

---

[1] The grounds upon which the defendants' motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 may have constituted sufficient grounds for the granting of a new trial pursuant to a harmless error standard.  But this Court may not treat the motion as a motion for a new trial because it lacks "some overt indication that the movant desires that relief."  U.S. v. Moran, 393 F.3d 1, 9-10 (1st Cir. 2004)  The defendants' motion here invoked only Rule 29, not Rule 33, and the only relief

of the government's first witness, Puerto Rico Police Department Agent Roberto Cruz ("Agent Cruz"), a member of the DEA Task Force, because his testimony was based improperly on hearsay and constituted "overview testimony;" (2) the Court erred in its instruction for "mere presence;" and (3) the evidence was insufficient as a matter of law to sustain the verdict of defendants' guilt.  The Court will first decide whether the jury instruction was proper.  It will next review the challenged testimony to decide what was properly admissible.  Then, once the Court has established what is admissible, it will conduct a sufficiency review.  U.S. v. Aviles-Colon, 536 F.3d 1, 13 (1st Cir. 2008) (holding that the court lacked authority to treat post-trial motion for judgment of acquittal as one for new trial).  For the following reasons, the defendants' motion for judgment of acquittal is **DENIED.**

## I.   Background

The Court does not rehash the entire trial here.  Rather, the Court provides at this stage a general description of the drug conspiracy to bring the grounds for acquittal into a workable perspective.  See U.S. v. Stierhoff, 549 F.3d 19, 21 (1st Cir. 2008).  Additional background information or facts may be added in the Court's subsequent legal analysis of particular issues as

---

requested was an outright acquittal.  Therefore, the Court may only address the request for acquittal, leaving open the question of whether the error addressed here would have been deemed harmless.

needed.  The Court conveys the facts throughout the opinion in the light most favorable to the verdict.  U.S. v. Rodriguez-Marrero, 390 F.3d 1, 6 (1st Cir. 2004).

A criminal investigation begun in 2007 targeted alleged drug trafficker Genito Toribio-Custodio ("Genito," "Toribio" or "Custodio"), whose organization trafficked significant amounts of cocaine between Colombia, the Dominican Republic and Puerto Rico. The investigation was led by the United States Drug Enforcement Agency ("DEA") but relied on local police.  During the course of the investigation in 2007, Genito detected surveillance units and fled to the Dominican Republic from Puerto Rico.  Contact with Genito was reestablished in the summer of 2008 through an informant, Marcos Antonio Torres ("informant" or "Torres").

On June 19, 2008 under the supervision of Puerto Rico Police Officer Agent Roberto Cruz,[2,3] the informant placed a recorded telephone call to Genito in the Dominican Republic to reinitiate contact and rejuvenate the investigation targeting Genito's organization.  Informant Torres informed Genito that merchandise - cocaine - was available in Puerto Rico.  Following that initial phone call Genito, informant Torres, and Genito's affiliate, Dario

---

[2]  The trial record indicates that Agent Cruz worked as an undercover agent for the failed 2007 investigation targeting Genito Toribio-Custodio in 2007.

[3]  Cruz was assigned to the Drug Enforcement Administration (DEA).

Pereyra-Rubis[4] ("Dario" or "Pereyra-Rubis"), coordinated through numerous telephone calls and in-person meetings[5] a drug transaction in which informant Torres would sell Genito (or his affiliate) multiple kilograms of cocaine at fourteen thousand dollars per kilo.  During one of these meetings, the informant showed Pereyra-Rubis sham cocaine to convince him that the drug deal was authentic.  The record is unclear as to whether Genito gave final authorization for the drug transaction, but the informant's testimony at trial indicated that Pereyra-Rubis was continually acting under the direction of Genito during the negotiations.  The final deal reached provided that Pereyra-Rubis, as a broker, would bring together informant Torres, acting as the seller, with unknown buyers who would pay $100,000 as an up-front down payment for fifteen kilograms of cocaine, the balance to be paid the day following the $100,000 payment.

On June 27, 2008, law enforcement agents videotaped and monitored the "reverse sting" operation.  Informant Torres met Pereyra-Rubis and the moving defendants Mieses and Reyes-Guerrero in the parking lot area of Borinquen Towers.  The defendants, who

---

[4] The record indicates that Pereyra-Rubis was known also as "Cabezon" or "Ponderosa."

[5] The in-person meetings took place between Dario Pereyra-Rubis and informant Torres, because Genito presumably remained in the Dominican Republic throughout the investigation.  Genito, however, did speak on the telephone with informant Torres on occasion.  Some of these telephone calls were recorded or surveyed by DEA agents and others were not.

were parked in a Ford Freestar van, interacted with the informant.
Defendant Mieses, who was driving the van, told the informant that
the money was complete.  The defendants retrieved a Reebok shoebox
containing cash money, which they showed to the informant.  When
informant Torres walked away from the van pretending to retrieve
the drugs for the defendants, he gave an agreed-upon signal for
arrest following his sighting of the money.  The defendants were
then arrested.  Pereyra-Rubis was not part of the trial because he
fled and remains to date a fugitive.

The government's case in the five-day trial consisted
primarily of four witnesses: Agent Cruz, informant Marcos Antonio
Torres, Puerto Rico Police Officer Jose Melendez-Cruz (who also
worked as a DEA agent), and Puerto Rico Police Officer Victor
Javier Salgado-Betancourt (assigned to work for DEA's High Identity
Drug Traffic Area Task Force).  The defendants presented no
witnesses.

## II.  Legal Standards and Analysis

### A.  "Mere Presence" Jury Instruction

Defendants requested the Court to instruct the jury as
follows:

> A defendant who was present at the scene of a crime and
> who had knowledge that a crime has been committed cannot
> be convicted of either aiding and abiding or conspiracy
> unless the Jury can reasonably infer that the defendant
> had or shared the specific intent of the alleged
> principal.

> Further, the fact that criminal activity occurs in front of someone does not always allow the inference that the defendant was someone who was a participant to the conspiracy.  Mere association between the principal and those accused of either aiding or abetting or conspiracy is not sufficient to establish guilt nor is mere presence at the scene and knowledge that the crime was to be committed sufficient to establish aiding and abetting or conspiracy.

The Court instructed the jury that "Mere presence at the scene of a crime is not alone enough, but you may consider it among other factors . . .".

"[The] [C]ourt [of Appeals for the First Circuit] has held that failure to give a requested jury instruction is reversible error only if the requested instruction is substantially correct, was not actually covered in the instruction given and covers an important point in the trial so that the failure to give it seriously impaired the defendant's ability to present a given defense." U.S. v. Nason, 9 F.3d 155, 166 (1st Cir. 1993) (citing U.S. v. Newton, 891 F.2d 944, 949 (1st Cir. 1989)).  In this case, the Court's instructions adequately covered the issue of "mere presence."  Not only did the Court directly instruct the jury that they must find more than the defendants' mere presence to render a guilty verdict, the Court also informed the jury that they must ascertain that "[T]he defendants knowingly and willfully joined in [the alleged conspiracy] agreement . . ." and ". . . that those who were involved shared a general understanding about the crime . . ." and that "mere similarity of conduct among various people, or the

fact that they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, but you may consider such factors." (*Jury Instructions*, Docket No. 74 at 14-15)   The Court also instructed the jury that "a person who has no knowledge of a conspiracy, but simply happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator."   Id. at 16.

The Court views its jury instructions regarding mere presence to have substantially and adequately covered the government's burden to issue.   Especially viewed in conjunction with the Court's additional instructions (1) reciting the government's burden of showing that each defendant participated knowingly and willingly in the conspiracy to be deemed conspirators, (2) stating clearly that association and similarity does not establish a conspiracy, and (3) reminding jurors that behavioral happenstance does not establish an individual's participation in a conspiracy, the Court rejects the defendants' "humble opinion" that "the instruction used by the court . . . is insufficient in instructing the jury as to the law . . .". (Docket No. 80 at 9)   As the government noted in its opposition to the defendants' position, "the defense's humble opinion is not the standard."   (Docket No. 91 at 4)   Because defendants' requested instructions were adequately covered by the instructions given to

the jury, the refusal to give the instructions requested by the defendant is not error.  <u>Nason</u>, 9 F.3d at 161.  Accordingly, the Court finds that the instructions given to the jury in this case on "mere presence" were proper.  On grounds that the Court's jury instructions erred, the defendants' motion is **DENIED**.

### B.   Agent Cruz's Testimony

Defendants contend that the government used Cruz's testimony, which they allege was mostly hearsay and constituted impermissible "overview testimony," to "paint a picture of guilt before the evidence had been introduced" to the jury, thus creating undue prejudice against them.  (Docket No. 80 at 7)  Defendants argue that Cruz's testimony "repeatedly expressed his opinion, without any personal knowledge."  Specifically, defendants protest the following testimony:

1.   [Cruz] repeatedly vouched for the credibility of an informant who has a prior criminal record and whose testimony has to be taken with caution.  Agent Cruz said that the informant was credible and reliable.
2.   [Cruz] believed that defendants Reyes-Guerrero and Mieses were the owners of the $100,000.00 which would be used as down payment of the sham cocaine.

3.   Without listening to any audible recordings, [Cruz] recounted the words allegedly said by defendants Reyes-Guerreo and Mieses to informant Torres, in that they wanted to 'complete the drug transaction and 'the money was complete'.

<u>Id</u>. (original emphasis omitted)

Defense counsel objected to these portions of Cruz's testimony, among others, at trial, preserving them for the record

upon which the Court now makes its second review of Agent Cruz's contested testimony.  The Court will not address every objection made at trial, only those resurrected in the defendants' motion for judgment of acquittal.[6]  The Court realizes that the defendants' objections regarding Agent Cruz's testimony did not have the benefit, as does the Court, of a full record; no transcripts were available within the seven-day period that the motion was properly submitted, whereas the Court now may rely on the complete transcript in its review of Agent Cruz's testimony.  Because the defendants' three specific objections were made without reference to the actual record, the Court conducted an independent review of Agent Cruz's testimony based on the trial transcript.  Each of defendants' specific objections are now reviewed in turn.[7]

### 1.   Testimony Regarding the Informant's Credibility

Defendants argue that Agent Torres improperly testified regarding the government informant's credibility. Specifically, the defendants claim that Agent Cruz "repeatedly vouched for the credibility" of the informant and "said that the informant was credible and reliable."  In its review of the entire

---

[6]  Because the Court limits its inquiry into the admissibility of only the testimony which was objected, it does not determine whether other portions of Agent Cruz's testimony were impermissible or whether the admission of any previously contested testimony would be deemed harmless.

[7]  The Court addresses the objections not in the order raised by the defendants' motion but in the order most amenable for adjudication.

trial transcript, however, the Court found no testimony given by
Agent Cruz vouching for the credibility of the informant, and or
any statement regarding the agent's personal view regarding the
informant's credibility or reliability whatsoever.   The only
instance in which Agent Cruz discussed the informant's credibility
referred to Agent Cruz's understanding that the informant had to
regain the trust of one of the investigation's targets:

| | |
|---|---|
| Mr. COKER:[8] | . . . did there come a time when you and the informant discussed confidence? |
| AGENT CRUZ: | Yes sir. |
| Mr. COKER: | Explain. |
| AGENT CRUZ: | The informant let me know he understood that there was no trust between Cabezon[9] [referring to Dario Pereyra-Rubis] and him, the informant.  That was the reason why I then gave instructions to the informant that we were going to hold another meeting and that he was going to show Cabezon some fake kilos, some shams.  And that is what the informant did. |

*Transcript of Excerpt of Proceedings*, Docket No. 86 at 22-23.

          Agent Cruz therefore testified that Dario Pereyra-
Rubis initially did not trust the government's informant and the
informant was therefore instructed to act in ways intended to

---

[8]  Assistant United States Attorney Courtney Coker conducted the
direct examination of Agent Cruz.

[9]  The record indicates that Dario Pereyra-Rubis was known also as
"Cabezon" or "Ponderosa."

regain the target's confidence.[10]  In the Court's view, such statements refer to the informant's relationship with one of the targets of the government's investigation, and have no bearing on whether the testifying agent himself viewed the informant as a credible person.

The only section in which Agent Cruz testified about his own relationship with the informant came in toward the beginning of his testimony and went as follows:

    MR. COKER:      Did you use an informant in this case?

    AGENT CRUZ:     Yes, sir.

    MR. COKER:      And who was the informant that you used
                    in this case?

    AGENT CRUZ:     Informant Number 117734.

    MR. COKER:      How long have you worked with this
                    informant?

    AGENT CRUZ:     Since 19-- No. Since 2005.

    MR. COKER:      Does this informant follow directions?

    AGENT CRUZ:     Yes, sir.

    MR. COKER:      Have you found this informant to be
                    successful for you?

    AGENT CRUZ:     Yes, sir.

    MR. COKER:      Who supervises this informant?

---

[10]  Later on during his testimony, Agent Cruz described a meeting between the informant and Cabezon.  Agent Cruz then said that, based on his conversations with the informant and observations made from the surveillance of the meeting, "there was plenty more trust" between the informant and Cabezon.  Id. at 31.

AGENT CRUZ:     I supervise him myself.

MR. COKER:      Now, when you supervise an informant, do
                you have to know his history?

AGENT CRUZ:     Yes, I have to know his history; and,
                periodically, every two or three months,
                I run his name through the system so I
                can check that he's not committing any
                crimes or offenses.

MR. COKER:      Did you find out the history of this
                specific informant when you began
                working with him?

AGENT CRUZ:     Yes, sir.

MR. COKER:      And how long has this specific informant
                been an informant for DEA?

AGENT CRUZ:     Since 1993.  Oh, I'm sorry.  Excuse me.
                2003.

MR. COKER:      2003.  Okay.  Why did this informant
                begin to work in 2003?

AGENT CRUZ:     This informant began working for us in
                2003 because he was arrested in Miami —
                in the state of Miami [sic] — for
                conspiracy to distribute drugs.

MR. COKER:      Did there come a time where he worked
                off that conviction?

AGENT CRUZ:     Yes, sir.

MR. COKER:      Let me back up just a second before we
                talk about that.  You indicated before
                he began working he was arrested and
                convicted.  Does that bother you as a
                supervisor that uses informants – Strike
                that question, your Honor.   Bad
                question.  Let me ask you this.  Is it a
                roadblock that the informant has a
                conviction for drugs?

AGENT CRUZ:     No, sir.

MR. COKER:        And tell the ladies and gentleman of the jury why.

AGENT CRUZ:       It is not a roadblock because this is a person that has already been inside the drug trafficking world.  He knows the way that each person inside the organization works.  That is a very good tool for us, the undercover agents, when we are on the street.  Because these informants are the people that have to present us as other drug traffickers as well.

Id. at 8-10.

Following the above exchange, Agent Cruz explained that the informant is paid for his services to the government, how much he is paid, and whether that amount is typical of amounts paid for informant services.

The defendants' objection to Agent Cruz's testimony on the grounds that he improperly vouched for the informant's credibility is misplaced.  Neither Agent Cruz's testimony regarding the informant's criminal history and the reasons that criminal history is helpful rather than a roadblock for rendering informant services nor Agent Cruz's testimony regarding the informant's payment indicate anything about Agent Cruz's personal view of the informant's credibility, either as a person of reliability, honesty, integrity or any other quality related to credibility.

All to which Agent Cruz testifies regarding the informant's credibility is his understanding that the informant's criminal history could aid in government drug investigations

because the informant would be familiar with the drug trade culture
and that the informant was attempting to build credibility with the
targets of this particular drug investigation.  The Court therefore
finds that Agent Cruz did not repeatedly vouch for the credibility
of an informant with a prior criminal record nor did he say at any
point during his testimony that the informant was credible and
reliable.

> **2.  Testimony Regarding Conversation Between Informant and Defendants**

Defendants object to the Court's admission of
testimony (by Agent Cruz) that "recounted the words allegedly said
by defendants Reyes-Guerrero and Mieses to informant Torres, in
that they wanted to 'complete the drug transaction' and 'the money
was complete'."  (Docket No. 80 at 7)  Nowhere in his testimony,
however, on direct examination, cross examination, redirect
examination or re-cross-examination, did Agent Cruz recount any
words allegedly spoken by defendants Reyes-Guerrero or Mieses.  In
fact, during the cross-examination of Agent Cruz, he testified that
he was not able to testify regarding the alleged drug negotiations
and/or exchange, implying that he lacked personal knowledge to
speak about these matters:

> MR. RIVERA-ROGRIGUEZ:[11]   No federal or state officer
> will take the stand to say
> what happened during the

_____

[11]  Luis Rivera-Rogriguez is defense counsel for defendant Juan
Mieses.

> negotiations or the purchase
> or selling of narcotics?

AGENT CRUZ:    During the negotiations, the only
               person that can take the stand to
               testify would be the informant.

*Transcript of Excerpt of Proceedings*, Docket No. 87 at 42-43.

Later on during the same cross-examination, Agent Cruz also testified that he could not hear what the informant and Dario Pereyra-Rubis were saying from his vantage point, from where he was providing surveillance during the transaction leading to the defendants' arrest. Defense counsel Mr. Rivera-Rodriguez asked how close Pereyra-Rubis's car was from the site of the drug exchange being surveyed:

AGENT CRUZ:    I continued driving until I found the
               informant and Rubis and I could see
               the van.  How much – I mean, what
               distance, I couldn't really say.  I
               kept driving until I could see the
               informant, Rubis, and the van.

MR. RIVERA-RODRIGUEZ:   But you couldn't hear what
                        they were saying, if
                        anything was said?

AGENT CRUZ:    No.  No.  No, I could not say what
               they were – I could not hear what they
               were saying.

. . . [Court interrupts regarding the use of an easel]
. . .

MR. RIVERA-RODRIGUEZ:   So you couldn't hear what
                        was being said from the
                        point where you were
                        standing on your vehicle?

AGENT CRUZ:    No.  Hear what they were saying?  No.

MR. RIVERA-RODRIGUEZ:      And for reasons, number one, you were far away from the area where the van was parked?

AGENT CRUZ:      Yeah.  Basically – You could say, yes. I mean, to be able to listen to a conversation you would have to be much, much closer.  Practically next to them.

. . . [Agent Cruz explains what he was able to see from the surveillance point] . . .

MR. RIVERA-RODRIGUEZ:      Did you use a recording device on the informant on June 27?

AGENT CRUZ:      Yes.  Yes, sir, we gave the informant a recording system.

MR. RIVERA-RODRIGUEZ:      So everything that was said there was recorded between the informant and Pereyra?

AGENT CRUZ:      Yes, part of that.

MR. RIVERA-RODRIGUEZ:      Everything that was said in that meeting was recorded, sir?

AGENT CRUZ:      No, sir.  What was clearly heard when they are in front of Mandy's part as they are walking, and you cannot hear very well when they are close to the van – to the Ford, as I explained a little while ago.  It's an avenue where so many cars go by.  There's a lot of noise, so – and they are on the outside, so there's not a lot of conversation that is heard.

MR. RIVERA-RODRIGUEZ:      So, sir, tell the members of the jury whether or not the are only two voices that are heard in that recording is the voice of Pereyra and the informant.

AGENT CRUZ:     Yes, I said that.

MR. RIVERA-RODRIGUEZ:     And Juan Meises' [sic] voice
                          is   not   heard   there
                          whatsoever; is that correct?

AGENT CRUZ:     No, sir.

. . .

MR. RIVERA-RODRIGUEZ:     And the video that you took
                          that day doesn't show Mr.
                          Juan Meises [sic] talking at
                          all?

AGENT CRUZ:     No, not at all.  Not talking.

Id. at 43-46.

It is clear from the record that Agent Cruz did not recount any words or statements made by defendants during negotiations observed at Borinquen Towers and that, in fact, Agent Cruz's testimony made clear that he was unable to hear any statements or talking whatsoever from either defendant as he listened to recordings taken at the scene of the drug exchange.[12]

**3.   Testimony Regarding Ownership of Money Used
to Buy Sham Cocaine**

Defendants also contend that Agent Cruz expressed his opinion, without personal knowledge, that the defendants were the owners of money to be exchanged for the sham cocaine during the government's set-up.  During his direct examination, Agent Cruz

---

[12]  Agent Cruz did, however, testify that he saw the defendants speak with the informant and Dario Pereyra-Rubis through a video image taken by another agent from a substantial distance from the crime scene during surveillance.

testified that the defendants arrived at a location under surveillance in a Ford Freestar van.  The two defendants were seated in the front seats of the van:  defendant Mieses was driving and defendant Reyes-Guerrero was in the passenger seat.  After the informant gave a signal indicating that he had seen the money to be used in the transaction, law enforcement officials intervened, arrested the two defendants, and searched the Ford vehicle.  During their search of the vehicle, law enforcement officials found a blue Reebok brand shoebox containing $100,000 in cash.

Agent Cruz later testified regarding the various roles played by individuals involved in the government's investigation, including the roles of the two defendants.  The transcript from this stage of the trial reads as follows:

MR. COKER:       Based on everything you observed, what was Cabezon's role?

MR. RIVERA-RODRIGUEZ:     Your Honor, I'm going to object to that line answers because its improper - it is soliciting opinions before the jury.

THE COURT:       Overruled.

AGENT CRUZ:      Mr. Cabezon, or Rubio Dario is his real name, he is a broker within the drug trafficking organization.

MR. COKER:       And what role did Juan Meises [sic] play?

MR. RIVERA-RODRIGUEZ:     Objection, your Honor. He cannot state as to

what was his role
there.

THE COURT:        Overruled. First of all, what is
                  a broker?

AGENT CRUZ:       A broker is a person that is
                  between the seller and the buyer.
                  And he earns a commission when
                  the deal is carried out.

THE COURT:        Okay.  Next question.

MR. COKER:        Okay.  What role did Juan Meises
                  [sic] play in this?

MR. RIVERA-RODRIGUEZ:     Objection, your Honor.

THE COURT:        Overruled.

AGENT CRUZ:       Juan Meises [sic] in this deal
                  was one of the buyers.

MR. COKER:        And what was the role of Jose
                  Reyes-Guerrero?

MR. ZAYAS-PEREZ:[13]   Objection.  Lack of personal
                  knowledge.

THE COURT:        Overruled.

AGENT CRUZ:       He was the other buyer.

MR. COKER:        One final question:  The whole
                  conspiracy and transaction, what
                  federal judicial district did it
                  occur in?

THE COURT:        What you have described during
                  your testimony, where did it
                  occur?

AGENT CRUZ:       In Puerto Rico.

---

[13] Ovidio Zayas-Perez is defense counsel for defendant Jose Reyes-Guerrero.

Id. at 47-49, 63-65.

In this and various other moments during his testimony, Agent Cruz states that the defendants were the buyers of the drugs and that the defendants were the owners of the money to be used for the drugs' purchase. (See, e.g. Docket No. 87 at 72, Docket No. 88 at 22) Agent Cruz said he drew his conclusion that the defendants were the owners of the money "Because Mr. Meises [sic] and Mr. Guerrero [sic] were the two that were in custody of the money at the time of the intervention" and "They were the two that were protecting that money so nothing would happen to it." (Id.)  Agent Cruz also expressed at multiple points during the cross-examination his belief, which he admitted was speculation, that defendant Mieses was the owner of the Ford van despite Agent Cruz's earlier testimony that the van was registered to another owner:[14]  "They still haven't told me who the owner of the van is. I still don't know.  For me, the owner of the van is the chauffeur at this time.  He was the one that had possession of the van at the

---

[14]  Earlier in his cross examination, Agent Cruz stated that the Ford van was not registered to either defendant:

> Mr. RIVERA-RODRIGUEZ:    The registered owner of the van
>                          who was it?
>
> AGENT CRUZ:   It was to the name of another person, the
>               registered owner of the Freestar van, as
>               well as the registered owner of the Mazda
>               Millenia were other people.

(Docket No. 87 at 46)

time of the intervention." (Docket No. 88 at 21; see also id. at
22)  Additionally, the Court found instances in which Agent Cruz
testified that Pereyra-Rubis referred to the "owners," of the
money, a plural form of the word "owner" indicating that there was
more than one single owner of the money to be used for the drug
purchase.  (See, e.g., Docket No. 87 at 32 and 33)

          Defendants   argue   that   Agent   Cruz's   testimony
regarding their role(s) in the drug transaction as owners of the
money to be used for the drugs' purchase lacked personal knowledge
and was based on hearsay, therefore constituting impermissible
overview testimony.  The defendants believe the government used
Agent Cruz "to paint a picture of guilt before the evidence had
been introduced to the jury."

          As support for their contention that Agent Cruz's
testimony was improper, defendants cite U.S. v. Casas, 356 F.3d 104
(1st Cir. 2004), which made clear the First Circuit Court of
Appeals's discomfort with "overview testimony."  In Casas, the
court of appeals held that the testimony of a government agent
regarding the defendants' participation in a drug conspiracy was
inadmissible hearsay. Id. at 117-18. Agent Stoothhoff's testimony
in Casas was given to prove that the alleged conspiracy existed;
allowing that testimony was found to be reversible error because
the testimony sought to establish the ultimate issue in the case
before the jury made its own determination.  According to the court

of appeals, "The government's misguided use of Agent Stoothoff to
map out its case and to describe the role played by individual
defendants raises a number of serious questions." Id. at 117.  The
court of appeals explains that initial witness overview testimony
is "inherently problematic" because "such testimony raises the very
real specter that the jury verdict could be influenced by
statements of fact or credibility assessments in the overview but
not in evidence." Id. at 119.  (internal citation omitted).
Further, the court of appeals cautions that "there is . . . the
possibility that later testimony might be different than what the
overview witness assumed." Id. at 119-20.  Finally, "overview
testimony by government agents is especially problematic because
juries may place greater weight on evidence perceived to have the
imprimatur of the government," and, therefore, the court of appeals
warns that "the government should not knowingly introduce
inadmissible evidence; it risks losing convictions obtained by
doing so." Id. at 120.

          More recently, between the defendants' filing of
their motion and the writing of this opinion, the court of appeals
reiterated with even more vehemence and clarity its view that
"there can be no justification in this circuit for the government's
repetition of the errors identified here in the use of overview
testimony in criminal cases.  If somehow prosecutors in the U.S.
Attorney's Office in Puerto Rico did not get the message before

about the dangers of such testimony, they should surely get it now. And they should draw no comfort from the fact that the harmless error analysis we are now required to undertake saves these convictions despite the misuse of overview testimony." U.S. v. Flores-De Jesus, 569 F.3d 8, 27 (1st Cir. 2009).  The court of appeals went on to warn errant prosecutors that they will henceforth be subject to sanctions before the Department of Justice or other local attorney disciplinary body, as well as to disciplinary action before the court of appeals itself.  These unclouded words from the court of appeals require this Court to reexamine carefully its own choices at trial.

The United States contends in its opposition to the defendants' motion for judgment of acquittal that "the testimony of Agent Cruz was unequivocally not overview testimony nor opinion testimony and was completely based on his first hand investigation."  (Docket No. 91 at 3)  "After a thorough review of the transcript of Agent Roberto Cruz's testimony," the United States goes on to argue, "Cruz was not a witness put on the stand to summarize the testimony of any witness."  Id.  Citing no authority, the United States explains that the reason Agent Cruz's testimony was not overview testimony is because Agent Cruz was the informant's supervisor, thus Agent Cruz told the informant what to do; Agent Cruz was present nearby in most of the meetings between the informant and co-conspirator, Pereyra-Rubis; Agent Cruz

listened to all the phone calls recorded by the informant; Agent
Cruz participated in surveillance; and Agent Cruz participated in
all stages of the investigation.  Id.  Because Agent Cruz was
himself a supervising agent in this investigation, the United
States seems to argue, he was called to testify as a fact witness
with personal knowledge.  Id.  The Court finds the United States's
reasoning as lacking a basis in the available caselaw which is
authority on this issue.

          The Court has independently reviewed the trial
transcript.  Although Agent Cruz's testimony overall was sometimes
based on personal knowledge, and sometimes given where a proper
foundation was laid, sometimes it was not.  More importantly, the
Court must concede that portions of Agent Cruz's testimony were
"precisely the type of testimony condemned" by the court of appeals
in the Casas case.  To be clear, the Court now finds that it
incorrectly admitted portions of Agent Cruz's testimony.  Among
those errors was that pointed to by defendants in their motion for
judgment of acquittal:  when Agent Cruz stated that both defendants
were the owners of the $100,000 used in the drug exchange, that
testimony was equivalent to saying that each defendant was guilty
of the conspiracy charged, which would be improper testimony.

          The court of appeals has drawn clear boundaries
between permissible and impermissible "overview testimony" at the
beginning of trial.  Flores-De Jesus, 569 F.3d at 19-20.  "There

may be value in having a case agent describe the course of his
investigation in order to set the stage for the testimony to come
about the nature of the conspiracy and the defendants involved."
Id. at 19.  Such testimony may provide a helpful roadmap laying out
the general organization and culture of drug organizations and
related drug deals.

          Agent Cruz's testimony regarding the ownership of
the $100,000, however, did not fall into the category of helpful,
proper testimony regarding the general structuring of a drug
conspiracy.   Nor was this testimony "properly limited to
constructing the sequence of events in the investigation."   Id.
(internal quotation and citation omitted).  Although the government
correctly points out that Agent Cruz was actively involved in the
investigation of this particular conspiracy, he nevertheless went
beyond the bounds of permissible testimony by "express[ing]
opinions as to defendants' culpability based on the totality of
information gathered in the course of [their] investigation."  Id.
(internal citation and quotation omitted).  By stating that the
defendants were the "owners" of the $100,000, Agent Cruz
"essentially testified that each of the defendants was guilty of
the conspiracy charged."  Casas, 356 F.3d at 119.  This cannot be
allowed.

          What the court of appeals has explained is damaging
about this sort of testimony is the "imprimatur problem" - "juries

may place greater weight on evidence perceived to have the imprimatur of the government." Id. at 120. The imprimatur problem is not nullified by later corroboration of the overview testimony (as occurred in this case); it is still viewed as "improper . . . for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury," Flores-De Jesus, 569 F.3d at 17 (internal quotation and citation omitted) because the overview testimony is "an endorsement of the veracity of the testimony that will follow." Id. at 18.

Therefore, though Agent Cruz's opinion that the defendants were the owners of the $100,000 may have been based on his extensive experience as a DEA agent and police officer, and on evidence submitted at trial (including, in this case, the informant's testimony and various photographs, telephone conversation recordings and video images) it remains an opinion not based squarely on personal knowledge as required for lay witness testimony. In U.S. v. Garcia, 413 F.3d 201, 211 (2nd Cir. 2005), the Second Circuit Court of Appeals explained that it is error "to allow law enforcement witnesses to express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigations." Analyzing a case agent's testimony giving an opinion regarding the defendant's role in a conspiracy, the Second Circuit Court of Appeals cited Federal Rule of Evidence 701's requirement that "lay opinion testimony" be

"based on the witness's personal perceptions."[15]  <u>Id.</u>  The Second
Circuit Court of Appeals found that the agent's opinion in <u>Garcia</u>
"was not limited to his personal perceptions but drew on the total
information developed by all the officials who participated in the
investigation leading to Garcia's arrest."  <u>Id.</u> at 212.  The
agent's opinion in <u>Garcia</u> did more than summarize his actions as an
agent; "it told the jury that Klemick, an experienced DEA agent,
had determined, based on the total investigation of the charged
crimes, that Garcia was a culpable member of the conspiracy."  <u>Id.</u>
The Second Circuit Court of Appeals went on to say that such an
opinion "cannot be equated with that of an undercover officer who,
in testifying to his direct dealings with a group of persons, may
offer an opinion as to what the words and actions witnesses
conveyed about the relative relationships of the participants.  <u>Id.</u>
at 213-14.

          Agent Cruz was not an undercover agent present at
the moment the defendants made their first appearance in the

---

[15]  Rule 701 states:

     If the witness is not testifying as an expert, the
     witness' testimony in the form of opinions or inferences
     is limited to those opinions or inferences which are
     (a) rationally based on the perception of the witness,
     (b) helpful to a clear understanding of the witness'
     testimony or the determination of a fact in issue, and
     (c) not based on scientific, technical, or other
     specialized knowledge within the scope of Rule 702.

investigation, at the time of the drug exchange itself.  Nor was
Agent Cruz testifying as an expert.[16]  Importantly, Agent Cruz was
unable to hear any of the words allegedly spoken by the defendants
at the time the informant approached them to make the drug
exchange.  Agent Cruz's testimony regarding the defendants'
ownership of the $100,000 is thus not based on his personal
knowledge and, most critically, cannot escape the imprimatur
problem found and strongly reproved by the First Circuit Court of
Appeals on numerous occasions.

          The Court recognizes that Agent Cruz's testimony
regarding the defendants' ownership of the $100,000 was improper
and, as such, ought not to have been admitted at trial.  Further,
the Court hopes its finding serves as a warning to prosecutors in
this district that overview testimony will be treated as
presumptively improper.  The Court comes to this conclusion in
recognition of the serious consequences that may result from
allowing prosecutors to use overview testimony as a shortcut to
meeting their burden - proving each element of a charged crime
beyond a reasonable doubt.  The Court hereby recognizes that its

---

[16] As the First Circuit Court of Appeals points out, whether Agent
Cruz was an expert still would not have made his opinion testimony
regarding the defendants' culpability admissible: "The Casas court
thus appropriately noted that 'expert witnesses have leeway other
witnesses do not,'" however, ". . . 'Agent Stoothoff's testimony
that particular persons were members of the conspiracy was not an
appropriate subject for expert testimony'." Flores-De Jesus, 569
F.3d at 20 (quoting from Casas, 356 F.3d at 120).

duty to guard the integrity of the jury from potentially misleading prosecutorial tactics includes prohibiting improper overview testimony.

### C.   Sufficiency of the Evidence

A court may enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. FED.R.CRIM.P. 29(a).  A defendant may move the court for a judgment of acquittal after the close of the government's case or at the close of all evidence.  Id.  Courts may reserve their decision on the motion, submit the case to the jury, and decide upon the motion before or after the jury returns a verdict of guilty.  FED.R.CRIM.P. 29(b).  A defendant may move for judgment of acquittal within seven days after a guilty verdict or after the discharge of the jury, whichever is later.   FED.R.CRIM.P. 29(c)(1).   In this case, defendants made a Rule 29 motion in writing on March 3, 2009, within the seven days permitted following the jury's guilty verdict on February 23, 2009.

In reviewing a motion for judgment of acquittal, courts must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt."  U.S. v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).  This standard requires the resolution

of all evidentiary disputes and credibility questions in favor of the government; the Court must also draw all reasonable inferences in favor of the government's case.  Id.  Thus, the jury's verdict stands unless the evidence could not have persuaded a rational trier of fact of the defendants' guilt beyond a reasonable doubt. U.S. v. Soler, 275 F.3d 146, 151 (1st Cir. 2002) (citing Lara, 181 F.3d at 200).

        In this case, to prove the defendants' culpability of the charged conspiracy, the government was required to show "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy."  U.S. v. Gomez-Pabon, 911 F.2d 847, 852 (1st Cir. 1990).  The government must show "intent to agree and intent to commit the substantive offense" to establish that each defendant was involved in a conspiracy.  Id. at 853 (internal citations and quotation omitted).  The government was not required to show that each co-conspirator knew about or had contact with all other members of the conspiracy or knew details about and participated in every act in furtherance of the conspiracy.  U.S. v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008) (citing U.S. v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir.2002)); see also U.S. v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989) ("A defendant may culpably join a drug-trafficking conspiracy without knowing the full extent of the enterprise or the identities of all the coconspirators.").

          The Court assesses only the admissible evidence at trial
in applying the sufficiency standard.  U.S. v. Aviles-Colon, 536
at 13.  The Court has found Agent Cruz's testimony regarding the
defendants' roles as owners of the money to be used for drug
purchase inadmissible.  Even assuming, *arguendo*, that *all* of Agent
Cruz's testimony were found inadmissible, requiring this Court to
disregard *all* of his testimony, the Court still finds that
sufficient evidence exists to support the defendants' convictions.

          The defendants contend there was no direct evidence
showing they were both active members of the conspiracy.  They
argue that the evidence only supports the inference of mere
presence at the site of the drug transaction and that, "even if
they had knowledge of [a co-conspirator's] intent this did not
amount to become a willful member of the conspiracy."  (Docket
No. 80 at 11)  Defendants explain that "the main and only witness
with knowledge of the facts of the alleged conspiracy presented by
the government" was the informant, and that the informant testified
that he never spoke on the phone with either of the moving
defendants nor saw them prior to the day of their arrest:
Informant Torres spoke "only briefly" with defendant Mieses, who
was driving the van, who said only that the money was complete,
while defendant Reyes-Guerrero did not speak to the informant.
(Docket No. 80 at 10)

Defendants cite <u>U.S. v. De La Cruz-Paulino</u>, 61 F.3d 986 (1st Cir. 1995) in support of their contention that more than mere presence is needed to support their convictions.  In <u>De La Cruz-Paulino</u>, the First Circuit Court of Appeals held that the government had not shown the defendant to possess the specific intent and knowledge necessary to sustain her conviction for aiding and abetting.  Unlike <u>De La Cruz</u>, the government brought forth evidence in this case showing the affirmative participation of both defendants in the drug transaction.

The Court finds defendants' argument unconvincing in the face of the ample evidence presented by the government at trial. All three of the government's witnesses following Agent Cruz (whose testimony is disregarded here) testified such that a jury could easily have found both defendants to be guilty of conspiracy beyond a reasonable doubt.  In addition, the jury was able to view for itself the video surveillance, see photographs, and listen to phone recordings or read phone call transcripts that collectively could have led to the conclusion that both defendants were members of the illegal enterprise.

Informant Torres testified that Pereyra-Rubis acted as a broker for "clients" who had money to buy kilograms of cocaine from Torres.  Torres explained that Pereyra-Rubis did not trust him initially, requiring a lot of effort on the part of Torres to secure Pereyra-Rubis's confidence.  At one meeting monitored by DEA

agents and recorded on video, Torres showed Pereyra-Rubis "sham cocaine" to bulk up his credibility with Pereyra-Rubis, following which Torres testified "after he [Pereyra-Rubis] saw the kilos of cocaine he [Pereyra-Rubis] felt very happy, he felt comfortable-."

        The government introduced numerous recorded telephone calls made between the informant and Pereyra-Rubis.  Informant Torres testified that, during one recorded phone call, Pereyra-Rubis indicated he was having trouble convincing "his people" that they had to bring sufficient money up front in order for Torres to agree to the deal.  Referring to another recorded phone call, Torres testified that Pereyra-Rubis confirmed he had $100,000 and wanted to meet in person because there were too many phone calls. Referencing a phone call recorded on the day of the arrest, Torres testified that Pereyra-Rubis said he was with the "owners of the money; and that he was desperate to, you know, make the deal, and he didn't want the people to get bored and leave."  Torres also said that Pereyra-Rubis was in a hurry to close the deal because he was counting on "these other people who are his associates in this case" and worried that if things did not proceed as Pereyra-Rubis had indicated to those associates, the deal would sour.  After listening to another phone call recording, Torres testified that the deal was finalized with Pereyra-Rubis at fifteen kilograms of cocaine at $14,000 per kilogram and that the owners were going to bring $100,000 up front with the balance to be paid the following

day.  Torres testified that he and Pereyra-Rubis agreed to meet at 2:00 pm the following day at Borinquen Towers[17] to exchange the sham cocaine for the $100,000 down payment.

Torres confirmed that DEA agents monitored the entire drug transaction at Borinquen Towers using video surveillance and a recording device.  After watching portions of the video taken from the scene on the day of the defendants' arrest, Torres recalled Pereyra-Rubis saying that he (Pereyra-Rubis) had been at the location for awhile "but that he was waiting for the owners of the money that were going to come."  Torres described walking to a parked van with Pereyra-Rubis.  In open court, Torres identified defendant Reyes-Guerrero as the passenger in the van, and defendant Mieses as the driver, and remembered that the defendants introduced themselves in a "really soft voice" such that he was unable to make out their names.  Torres said he asked the defendants "are you ready?" to which defendant Mieses responded, "yes," and the passenger, Reyes-Guerrero, nodded yes with his head.  According to Torres, the driver "proceeded to take a box out from behind his seat," after Torres asked about the money's whereabouts.  Torres said the passenger, Reyes-Guerrero, assisted Mieses because the box was difficult to dislodge from beneath the driver's chair.  Torres proceeded to examine the money, asking the driver, "how much is

---

[17]  Torres informed Pereyra-Rubis of the location for the drug sale in a later recorded phone call.

there?"  Torres testified that the driver told him (Torres) that
there was $100,000 in the box.  Looking at a photograph taken of
the van's interior, Torres confirmed that it portrayed an accurate
and fair description of what the van looked like to Torres on the
day of the defendants' arrest.  Finally, Torres recalled the
driver, Mieses, asking him about the merchandise.  Torres told the
driver the merchandise (the cocaine) was in his car.  As Torres
walked away from the van, he said that he gave the DEA agents a
signal indicating that he saw the money.

        The Court finds that informant Torres's testimony, alone
and in spite of the well-established incentive for informants to
cooperate with the government, to be sufficient evidence for the
jury's guilty verdict.  Following informant Torres's testimony,
the government presented two more witnesses.  The first of these
was Jose Melendez-Cruz, a Puerto Rico police officer assigned to
work for the DEA Task Force.  Melendez-Cruz explained that he was
part of the surveillance team monitoring the drug transaction at
Borinquen Towers and, in that capacity, parked in a marked police
vehicle in a Burger King parking lot near to where the defendants
sat in the parked van.  According to Melendez-Cruz, he and his
partner, Agent Perez, approached the van in order to make the drug
arrest, with Melendez-Cruz intervening with the passenger and Agent
Perez with the driver.  Melendez-Cruz made in-court identifications
of both defendants.  He also testified that he was able to observe

a blue shoebox in the van containing an "undetermined amount of money." Melendez-Cruz said that pictures were taken of the box and the money at the police station following the arrest. Melendez-Cruz identified the actual shoebox in court along with his initials written on the evidence label and the seal used to close the evidence.

The government's final witness was Victor Javier Salgado-Betancourt ("Salgado"), a Puerto Rico Police officer working at the High Identity Drug Traffic Area (HIDTA) Task Force who specializes in "finding secret compartments in motor vehicles and residencies." Salgado testified that he discovered a secret compartment in the floor of the van driven by defendant Mieses and in which defendant Reyes-Guerrero sat as a passenger. A video taken of Salgado's examination of the van was entered into evidence during Salgado's testimony as a government witness. Salgado said that this floor compartment was not a standard feature on a Ford Freestar motor vehicle.

The government presented three witnesses other than Agent Cruz. The government also presented numerous video tapes, photographs, phone call recordings, transcripts of phone call recordings, and physical evidence. Consequently, after reviewing the evidence and resolving all credibility issues in the verdict's favor, the Court finds that a rational jury could have found both defendants Mieses and Reyes-Guerrero guilty of conspiracy beyond a

Criminal No. 08-244 (FAB)                                          37

reasonable doubt.  The Court wishes to reiterate, however, that because it was moved for defendants' acquittal, it was required to apply the sufficiency of evidence standard, an analysis viewing evidence in favor of the government and setting the bar quite high for defendants to hurdle.  The Court thus does not reach the question of whether the introduction of Agent Cruz's testimony constitutes harmless error because it was not moved for a new trial, which would have required such an analysis.

## CONCLUSION

For the reasons discussed above, defendants' motion for judgment of acquittal is **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, July 28, 2009.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE